**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**LEWIS T. BABCOCK, JUDGE**

Civil Case No.  08-cv-00526-LTB

LINDA K. BAIN,

        Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

_____

# ORDER
_____

      Plaintiff, Linda K. Bain, appeals the final decision of Michael J. Astrue, Commissioner of

Social Security, denying her application for Social Security Disability benefits.  Following a July

11, 2007, hearing, the Administrative Law Judge ("ALJ") issued an unfavorable decision on July

25, 2007.  The Appeals Council denied Plaintiff's request for review of the ALJ's decision, thus

making it the Commissioner's final decision.  Plaintiff has exhausted her administrative remedies

and this case is ripe for judicial review.  Jurisdiction is proper under 42 U.S.C. § 405(g).  Oral

argument would not materially assist the determination of this appeal.  After consideration of the

parties' briefs and the administrative record, and for the reasons set forth below, I REVERSE

and REMAND.

## I.  BACKGROUND

      Plaintiff was born on April 23, 1954, and was fifty-three years of age at the time of the

hearing.  [Administrative Record "AR" 123].  She has a high school education and additional

training in computers.  [AR 131–32].  Her past work history includes employment as a hostess

and cashier in a restaurant, a shipping and receiving clerk, and a stocker.  [AR 127–28].  Plaintiff claims she is disabled due to asthma, arthritis, and pain in her back, hips, legs, knees, and arms.  [AR 126].  Plaintiff's alleged onset date is January 1, 2002, and her date last insured is December 31, 2004.  [AR 94, 123].

## A.  Plaintiff's Medical History

Plaintiff was treated for lower back and right leg pain and radiculopathy beginning in January 1999 at the Longmont Clinic.  [AR 224, 231, 233].  In April 2001, her treating physician noted "the reflexes remain hyperactive to a concerning degree" and recommended a cervical spine MRI and a lumbar spine MRI.  [AR 231].  The MRI films revealed mild loss of spinal curvature, mild arthritis, and mild disk space narrowing at C3–4 and C4–5.  [AR 226].  Plaintiff was prescribed pain killers—including Celebrex, Relafen, Ultram, and Darvocet—which provided some relief.  [AR 226, 291–92].  In September 2001, Plaintiff reported her symptoms were getting worse.  [AR 223].  Plaintiff reported additional pain to her treating physician throughout 2001, 2002, and 2003.  [AR 192, 193, 196, 197, 207, 211, 215, 221].

Plaintiff was treated for back and leg pain at Orthopedic Associates, L.L.C., beginning in December 2001.  [AR 291–92].  Her treating physician noted moderate degenerative disk changes at L4–5 and L3–4 with a protrusion at the L4–5 level extending to the right, nerve root irritation arising from the L4–5 level, and right lower extremity symptoms consistent with lumbar radiculitis.  [AR 241, 291].  Plaintiff reported she was taking Ultram for her pain, but was experiencing "just minimal improvement."  [AR 292].  Plaintiff was prescribed Neurontin, which gave her about sixty percent improvement of her lower back symptoms, although her knee pain increased during this time.  [AR 290].  In December 2002, Plaintiff reported she had received

acupuncture, which provided minimal benefit, and was continuing to take Neurontin and Ultram, which "seem[ed] to give her a steady amount of pain relief." [AR 282]. In April 2003, Plaintiff had a lumbar MRI that revealed extensive degenerative disk changes, disk protrusions, and scoliosis, as well as an acute insufficiency fracture of the L1 vertebral body. [AR 258]. Plaintiff continued to report additional pain periodically throughout 2002, 2003, and 2004, although she canceled an appointment in May 2002 because she "said she didn't have that much back pain." [AR 262–88, 287].

In April 2002, Plaintiff had an MRI performed on her right knee which revealed a medial meniscus tear. [AR 289]. Plaintiff underwent surgery on the right knee in August 2003. [AR 275]. Plaintiff also had an MRI performed on her left knee in April 2002 which revealed a large joint effusion and torn medial meniscus. [AR 288]. Plaintiff underwent arthroscopic surgery to repair her left knee in May 2002, and reported her knee "feels a little bit better" in June 2002. [AR 285]. Plaintiff was able to walk without a limp or crutches at that time. [AR 285].

In July 2002, Plaintiff reported pain when using chairs, stairs, and a bike, but showed full range of motion in both knees. [AR 284]. In September 2002, Plaintiff showed normal gate and full range of motion. [AR 283]. In May 2003, Plaintiff complained of increased pain and swelling in the left knee. [AR 278]. Plaintiff reported she was "doing well" with "no complaints" in September and November 2003. [AR 273, 274].

In March 2003, Plaintiff reported her exercise program consisted of walking. [AR 210]. Plaintiff was diagnosed with recurrent bursitis of the right hip in May 2003. [AR 277]. A steroid injection provided relief for six months, and was repeated in December 2003 and again in November 2004. [AR 266, 272]. Plaintiff was also diagnosed with arthritis in her left hand in

January 2004. [AR 355]. An examination in June 2004 revealed "fairly pronounced degenerative changes" with "an essentially complete loss of articular cartilage with some degree of sclerosis." [AR 336]. Plaintiff's physician noted she had pain and reduced dexterity as a result of her arthritis. [AR 346].

A spinal MRI performed in January 2005—after Plaintiff's date last insured—showed severe degenerative changes and severe foraminal narrowing at L4–5, and additional degenerative spinal disease at L3–4, L2–3, and L1–2. [AR 259–60]. Epidural injections were recommended. [AR 262–64]. Plaintiff continued to report pain to her treating physicians. [AR 262–64]. A left hand x-ray report in January 2006, showed osteopenia with no evidence of fracture. [AR 355].

In June 2007, Plaintiff's treating physician, Dr. Hughes, completed a Medical Source Statement of Ability to do Work-Related Activities. [AR 344–49]. Dr. Hughes indicated Plaintiff could lift up to ten pounds continuously and eleven to fifty pounds occasionally; could carry up to ten pounds frequently and eleven to twenty pounds occasionally; could sit for four hours continuously and for six hours in an eight hour workday; could stand for one hour continuously and for two hours in an eight hour workday; could walk for thirty minutes continuously and for one hour in an eight hour workday; could frequently reach, push, or pull with either hand, and occasionally handle, finger, or feel with either hand; and could occasionally climb stairs, balance, stoop, kneel, crouch, or crawl.

Because the Medical Source Statement was written after Plaintiff's last date insured, Dr. Hughes filled out a supplemental questionnaire addressing Plaintiff's limitations prior to that date. [AR 352–54]. Dr. Hughes reported Plaintiff experienced musculoskeletal impairments,

pain and joint stiffness, and work-related restrictions prior to December 31, 2004, and added: "She surely had functional restrictions but they are progressive and have increased." [AR 352].

## B. Disability Hearing

At Plaintiff's hearing on July 11, 2007, Plaintiff testified she had been unable to work since January 2002 because "I have all these pains that keep me from doing the physical parts of jobs that are out there. My leg always hurts and my foot and my back. Then my hands get all cramped up and stiff." [AR 45]. Plaintiff testified her problem had gotten worse since January 2002, and she acquired additional symptoms since that time, including wrist, elbow, and knee pain. [AR 45].

Plaintiff testified that in 2004 she was unable to sit for a day without laying down, had to sit with her legs elevated, and was unable to stand for thirty minutes or walk more than five minutes. [AR 47–48, 56]. Plaintiff did laundry, vacuumed, swept, and made her bed, but only for short periods of time with breaks or with help from her husband. [AR 48–50]. Plaintiff slept poorly at night and took frequent rest breaks. [AR 50]. Her medications also made her feel drowsy. [AR 50–51]. She was only able to cook quick meals. [AR 53]. She had trouble buttoning clothes and holding onto things. [AR 57].

Referring to 2007, Plaintiff testified she had trouble lifting a gallon of milk, could sit for an hour, had to sit with her legs elevated, and could stand for an average of fifteen minutes. [AR 51–52, 56]. She was able to cook quick meals. [AR 52]. Plaintiff's most painful areas were her back and legs. [AR 53]. Her back pain was a constant ache, and her leg pain was a constant ache with additional shooting pain. [AR 53]. Plaintiff testified she had days where she had to lay down all day, and she had to lay down for part of the day every day. [AR 53–55]. Her

pain—which was as high as ten out of a scale of one to ten on bad days occurring approximately once per week—affected her ability to concentrate. [AR 56]. Plaintiff's husband helped her style her hair and get dressed. [AR 58].

William Tysdal, a vocational expert ("VE"), also testified at the hearing. [AR 64–73]. The ALJ inquired about Plaintiff's prior work history and asked the VE if a person who could sit for one hour at a time and then get up and stretch and go back to sitting throughout the workday; could stand one hour at a time, then sit down for a few minutes, and then resume standing throughout the workday; could walk for half an hour, sit down, and then go back to walking; could occasionally reach above shoulder level, bend, stoop, crouch, and crawl; and could never climb would be able to perform Plaintiff's past relevant work. [AR 65]. The VE answered "no." [AR 65]. The ALJ then added the age, education, and work experience of Plaintiff to the description of the hypothetical person. [AR 65–66]. The VE testified such a person could perform "light" and "unskilled" occupations in the regional economy including cashier, small products assembler, and survey worker. [AR 66]. The ALJ then inquired whether a person who could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds; could stand, walk, or sit six hours in an eight-hour day; could occasionally stoop, kneel, and crouch; and would need to avoid fumes, dust and other irritants could perform these occupations. [AR 67]. The VE responded "yes." [AR 67]. The ALJ added an additional limitation of being unable to lift more than twenty pounds above the waist, and the VE stated such a person would be still be able to perform the occupations. [AR 67]. When the ALJ added that the person would need to elevate his or her legs to chest level, the VE responded no jobs would be available. [AR 67–68]. The VE also testified that some of Plaintiff's previously-acquired skills would transfer

to sedentary jobs existing in the regional economy, including procurement clerk, customer order clerk, and sorter.  [AR 68].

Upon questioning by Plaintiff's attorney, the VE testified that a person who was unable to handle, finger, or feel more than occasionally would be unable to perform the positions of cashier, products assembler, procurement clerk, customer order clerk, and sorter.  [AR 70–71]. The VE also testified that a person who was unable to maintain the attention necessary to carry out detailed instructions for longer than two hours per day would have trouble performing the jobs of procurement clerk and customer order clerk.  [AR 72].

### C.  ALJ Ruling

In his ruling, the ALJ applied the five-step sequential evaluation process outlined in 20 C.F.R. § 404.1520.  Applying the first step, the ALJ determined Plaintiff had not performed substantial gainful activity during the period between her alleged onset date of January 1, 2002, and her date last insured of December 31, 2004.  [AR 17].  Applying the second step, the ALJ determined Plaintiff had severe impairments including: a history of bilateral knee arthroscopies, a mild left lateral disk protrusion at L3–4, right neural foraminal narrowing at L4–5 and L5–S1, L1 insufficiency fracture, bursitis of the S1 joint, and asthma.  [AR 17].  Applying the third step, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [AR 17].

Applying the fourth step, the ALJ determined Plaintiff was unable to perform past relevant work.  [AR 23].  The ALJ determined Plaintiff had the residual functional capacity to perform work with the following restrictions: lifting and carrying twenty pounds occasionally,

but not above the waist level, and lifting ten pounds frequently; standing for up to one hour at a time and walking for thirty minutes at a time for a combined total of six hours during an eight hour day; sitting for one hour at a time for a total of six hours in an eight hour day; occasionally reaching above shoulder level; never climbing; occasionally bending, crouching, stooping, kneeling, and crawling; and avoiding concentrated exposure to dust, odors, fumes, and other irritants. [AR 18].

In reaching his conclusion regarding Plaintiff's residual functional capacity at step four, the ALJ considered both the medical evidence and Plaintiff's testimony and concluded: "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." [AR 20]. The ALJ noted Plaintiff told her treating physicians on multiple occasions that she received relief from taking her prescription medications, and that Plaintiff was not compliant with taking her prescriptions as prescribed. [AR 20]. The ALJ also noted Plaintiff testified she was able to do household chores and drive a car. [AR 21]. While Plaintiff testified she was required to sit with her legs elevated—an arrangement that would preclude gainful employment—she never relayed this information to her physicians, and was never instructed to sit in that manner. [AR 21]. The ALJ further noted Plaintiff had complained of poor memory at her hearing, which called into doubt the accuracy of her recollection of her symptoms as of her date last insured several years prior. [AR 21].

Reviewing the medical records, the ALJ noted Plaintiff had received improvement from her knee surgeries, and Plaintiff reported no knee pain or other complaints after September 2003.

[AR 22].  The ALJ reviewed the extensive record of Plaintiff's back problems, but found no evidence that she had been placed on any functional restrictions by her physicians, nor had any physicians stated Plaintiff was disabled.  [AR 22].  The ALJ also reviewed the medical records issued after Plaintiff's date last insured, and noted none of these records established Plaintiff's disability as of December 31, 2004.  [AR 22–23].  Thus, while the ALJ gave the opinions of Plaintiff's treating physician, Dr. Hughes, "great weight," the ALJ found the opinions "clearly relate to the claimant's condition as of June 23, 2007, and are not germane to the period at issue in this case."  [AR 23].

After determining Plaintiff's residual functional capacity would prevent her from performing past relevant work at step four, the ALJ applied the fifth step and determined Plaintiff was able to perform jobs that existed in significant numbers in the national economy. [AR 23].  The ALJ determined that Plaintiff—with the residual functional capacity defined at step four—was able to perform the "light" and "unskilled" occupations of cashier, small products assembler, and survey worker.  [AR 24].  The ALJ then concluded that Plaintiff was not under a disability as defined in the Social Security Act from January 1, 2002, through December 31, 2004.  [AR 24].

### D.  Additional Material Submitted to the Appeals Council

In an additional report completed on the day of Plaintiff's hearing and subsequently submitted to the Appeals Council, Dr. Hughes indicated Plaintiff would have been limited to sedentary work during the time period he treated her, beginning June 2004 and extending through and beyond December 31, 2004.  [AR 358].  It is not clear whether this report was given to the ALJ prior to issuing his decision on July 25, 2007.  As the ALJ's decision makes no

mention of this report, however, I will not assume it was taking into consideration. *See Pitkin Iron Corp. v. Kempthorne*, 554 F. Supp. 2d 1208, 1216–17 (D. Colo. 2008).

## II. STANDARD OF REVIEW

My review in a Social Security appeal is limited to whether the final decision is supported by substantial evidence and the correct legal standards. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). Although I do not reweigh the evidence or try the issues *de novo*, I must examine the record as a whole—including anything that may undercut or detract from the ALJ's findings—in order to determine if the substantiality test has been met. *Id*. at 1262. Evidence is substantial if it amounts to "more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987). Evidence is not substantial if it is overwhelmed by other evidence in the record, or constitutes a mere conclusion. *See Grogan*, 399 F.3d at 1261–62. If the ALJ's decision is not supported by substantial evidence, or if the ALJ failed to provide a sufficiently clear basis from which I may determine the appropriate legal standards were applied, I may reverse or remand. *See Washington v. Shalala*, 37 F.3d 1437, 1440 (10th Cir. 1994).

## III. ISSUES RAISED

Plaintiff raises four issues on appeal: (1) the Commissioner failed to properly weigh Dr. Hughes's opinions; (2) the ALJ failed to properly evaluate Plaintiff's subjective complaints; (3) the ALJ improperly relied on the VE's testimony at step five; and (4) the ALJ improperly failed to apply the Medical-Vocational Guidelines to Plaintiff's case. I address each in turn.

# IV.  WHETHER THE COMMISSIONER IMPROPERLY DISREGARDED

# DR. HUGHES'S OPINION

On July 11, 2007—the date of Plaintiff's hearing before the ALJ—Dr. Hughes provided

Plaintiff's counsel an additional report indicating Plaintiff would have been limited to sedentary

work during the time period he treated her, beginning June 2004 and extending through

December 31, 2004.  The Appeals Council considered the report and made the following

determination:

> The report submitted by one of your treating physicians, Brian Hughes, M.D.,
> dated July 11, 2007, indicates your impairment limited you to sedentary work
> since prior to December 31, 2004.  However, this report and opinion is not
> entitled to controlling weight, since it is contradictory to his earlier report, which
> the Administrative Law Judge considered.  In that report (Exhibit 14F) he stated
> that your functional restrictions had progressively worsened and were different
> from those he listed earlier (Exhibit 13F).

Plaintiff argues it was error for the Appeals Council to reject Dr. Hughes's July 11, 2007, report

without additional inquiry.  I agree.

## A.  Factors the Commissioner must consider when weighing the opinion of a treating physician

The weight given a treating physician's opinion is determined using a two step inquiry.

First, the adjudicator—which can be the ALJ or the Appeals Council—must determine whether

to give the treating physician's opinion controlling weight.  *See Watkins v. Barnhart*, 350 F.3d

1297, 1300 (10th Cir. 2003).  Second, if the adjudicator determines the treating physician's

opinion is not entitled to controlling weight, the adjudicator must then determine how much

weight to give the opinion by applying the six factors provided in 20 C.F.R. §§ 404.1527 and

416.927.  *See Watkins*, 350 F.3d at 1300.  Unless good cause is shown to the contrary, a treating

physician's opinion should be given substantial weight.  *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984).

The first step of the treating-physician inquiry includes a sequential analysis of two factors.  *Watkins*, 350 F.3d at 1300; 20 C.F.R. § 404.1527(d)(2).  Applying the first factor, the adjudicator must determine if the treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.  *Watkins*, 350 F.3d at 1300.  If the answer to this question is "yes," the adjudicator applies the second factor and must determine if the opinion is consistent with other substantial evidence on the record.  *Id*.  If the answer to this question is also "yes," the opinion "must be given controlling weight; *i.e.*, it must be adopted." *See Kirby v. Astrue*, 568 F. Supp. 2d 1225, 1236 (D. Colo. 2008); Soc. Sec. Ruling 96-2p, 1996 WL 374188 at *1 ("SSR 96-2p").

If the answer to either question is "no," the adjudicator must proceed to the second step. A treating physician's medical opinion is entitled to deference and must be weighed using the six factors provided in 20 C.F.R. § 404.1527 and 416.927.  *See Watkins*, 350 F.3d at 1300.  These factors are: (1) the length of the treatment relationship and the frequency of the examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the adjudicator's attention which tend to support or contradict the opinion.  *Id.* at 1301 (citing *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)).  Social Security Agency rules make clear that the adjudicator must articulate his reasoning with specific and

legitimate findings at each step of the inquiry so that a subsequent reviewing court can determine the weight accorded to each opinion and the reasons for that weight. *Id.* (citing SSR 96-2p, 1996 WL 374188, at *5). A reviewing court will not presume the adjudicator applied the correct legal standards absent this analysis. *Id.*

### B. The Appeals Council did not properly apply the two step inquiry

In his original decision in this matter, the ALJ applied the relevant factors—as described in *Watkins* and 20 C.F.R. § 404.1527 and 416.927—to Dr. Hughes's opinions predating the July 11, 2007, opinion and found the opinions "entitled to great weight." [AR 23]. The Appeals Council, however, summarily rejected the July 11, 2007, opinion of Dr. Hughes. [AR 6]. The Appeals Council did not apply any of the steps required by *Watkins*. This was error. When an adjudicator chooses to reject the opinions of a treating physician, "he must demonstrate good cause for his rejection, setting forth specific and legitimate reasons for doing so in light of the six *Watkins* factors." *Kirby*, 568 F. Supp. 2d at 1236 (citing *Watkins*, 350 F.3d at 1300; *Washington*, 37 F.3d at 1440; *Byron*, 742 F.2d at 1235).

To the extent Dr. Hughes's prior opinions appeared inconsistent with his July 11, 2007, opinion, it was further error for the Appeals Council to reject the latter without additional inquiry. Before making a finding of inconsistency, an adjudicator must first undertake an inquiry into the clinical signs, laboratory findings, and medical bases used by the treating physician. *See Kirby*, 568 F. Supp. 2d at 1237 (citing SSR 96-2p, 1996 WL 374188, at *3). "'Because the evidence is in medical, not lay, terms and information about these issues may be implied rather than stated,' the adjudicator may not substitute his own speculation or lay opinion, but must undertake a medically-based inquiry into 'what the clinical signs and laboratory

13

findings signify.'" *Id.* (citing SSR 96-2p, 1996 WL 374188, at *3; *Langley v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir. 2004); *Shepherd v. Apfel*, 184 F.3d 1196, 1202 (10th Cir. 1999)).

Here, the Appeals Council determined that Dr. Hughes's opinion on Plaintiff's exertional ability—an opinion Dr. Hughes explicitly based on his "personal knowledge of Ms. Bain's clinical records and treatment history"—was medically incorrect. The Appeals Council, however, did not seek additional clarification on the perceived inconsistencies, nor did the record contain any expert evidence showing Dr. Hughes's conclusions were inaccurate. The only justification given by the Appeals Council was a supposed contradiction with a prior statement from Dr. Hughes indicating Plaintiff's conditions worsened over time. I am left to conclude the Appeals Council independently reached this conclusion based on speculation and lay opinion. This is not allowed. *See Kemp v. Bowen*, 816 F.2d 1469, 1476 (10th Cir. 1987) (holding that an adjudicator "can not interpose his own 'medical expertise' over that of a physician, especially when that physician is the regular treating doctor for the disability applicant").

On remand, if the ALJ determines the medical record—including the July 11, 2007, opinion of Dr. Hughes—is ambiguous or conflicting or otherwise inadequate to determine Plaintiff's disability—keeping in mind that an ALJ "is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability"—the ALJ should contact Plaintiff's treating physicians for additional information, as required by 20 C.F.R. § 404.1512. *See Robinson*, 366 F.3d at 1083, 1084; *Kirby*, 568 F. Supp. 2d at 1237. Further, should the ALJ determine that the July 11, 2007, opinion of Dr. Hughes should not be given controlling weight, the ALJ must then determine the appropriate weight in light of the six *Watkins* factors. *See Watkins*, *supra*, 350 F.3d at 1300.

14

## V.  WHETHER THE ALJ ERRED IN FAILING TO PROPERLY EVALUATE
## PLAINTIFF'S SUBJECTIVE COMPLAINTS

When considering what weight to give a claimant's subjective complaints, the ALJ must initially inquire whether the claimant had medically determinable impairments that could reasonably be expected to produce the alleged symptoms.  *See* 20 C.F.R. § 404.1529.  The ALJ found Plaintiff had such medically determinable impairments.  [AR 20].

Once such inquiry has been made, the ALJ must then evaluate the intensity and persistence of the symptoms in order to determine how the symptoms limit the capacity for work.  *See id.*  Such an inquiry "requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects."  Soc. Sec. Ruling 96-7p, 1996 WL 374186, at *1 ("SSR 96-7p").

### A.  Factors the ALJ must consider when making a credibility determination

"In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record.  An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."  SSR 96-7p, 1996 WL 374186, at *1.  "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision."  *Id*. at *4.

The ALJ must consider all of the available evidence, including the claimant's subjective complaints.  *See id.* at *2–3.  He should give "careful consideration" to the "location, duration,

frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness and side effects of any medication; treatment, other than medication, for pain relief; and the claimant's daily activities." *Hamby v. Astrue*, 260 F. App'x 108, 113 (10th Cir. 2008) (citing 20 C.F.R. § 404.1529(c)(3)) (internal formatting omitted). The ALJ should consider the degree to which the claimant's statements are consistent with the medical signs, laboratory findings, and medical history, and the degree to which the claimant's statements made in connection with his disability claim are consistent with the statements made to medical providers. *See* SSR 96-7p, 1996 WL 374186, at *5–6.

The ALJ should also take into consideration whether manifestations of the complained-of symptoms have been observed by the claimant's physicians or others. *See id.* In so doing, the ALJ must consider the claimant's entire medical treatment history:

> In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements. Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.

*Id*. at *7. On the other hand:

> the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other

information in the case record, that may explain infrequent or irregular medical
visits or failure to seek medical treatment.

*Id.* The ALJ should consider whether the claimant was able to afford the recommended

treatment, and whether the claimant had "been advised by a medical source that there is no

further, effective treatment that can be prescribed and undertaken that would benefit the

individual." *Id.* at *8.

### B. The ALJ based his credibility determination on substantial evidence

When considering Plaintiff's subjective complaints, the ALJ reviewed the medical record

and found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her

pain were not entirely credible. When the ALJ makes a credibility determination—as the ALJ

did here—such a determination will not be overturned on review so long as it is based on

substantial evidence and correct legal standards. *See Diaz v. Sec'y of Health & Human Servs.*,

898 F.2d 774, 777 (10th Cir. 1990).

As the ALJ noted, Plaintiff herself expressed some doubt as to her ability to separate her

symptoms at the time of the hearing from her symptoms in the covered period. Plaintiff's

reliance on medical records post-dating her date last insured indicates additional confusion in

this area. *See*, *e.g.*, Opening Brief of Plaintiff, pp. 11–12. Even without such candor, however, a

review of the entire record shows the ALJ's determination of Plaintiff's credibility was based on

substantial evidence. In contrast to Plaintiff's claims of constant and debilitating pain, Plaintiff

testified she was able to perform light housework, do her own grocery shopping, and drive a car.

[AR 48–50]. Likewise, although Plaintiff's medical record indicates relatively consistent reports

of pain to her treating physicians, it also includes numerous instances where Plaintiff reported

being free of pain, or experiencing significant improvement in her pain symptoms. [AR 272,

273, 274, 283, 284, 285, 286, 287, 290].  Additionally, although Plaintiff testified she could not walk for more than five minutes, and that walking increased her pain, she reported her exercise program in March 2003 consisted of walking.  [AR 210].

While this Court could have found Plaintiff's pain complaints to be credible based on a review of the record, I may not reweigh the evidence.  *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  My inquiry is limited to whether the ALJ's finding that Plaintiff's subjective complaints were not credible was based on substantial evidence and correct legal standards.  *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995).  I conclude it was.  Accordingly, it was not error for the ALJ to find Plaintiff's complaints "not entirely credible."

## VI.  WHETHER THE ALJ IMPROPERLY RELIED ON THE VE'S TESTIMONY TO DETERMINE PLAINTIFF COULD PERFORM ALTERNATE WORK

Once a claimant establishes she is unable to return to her past relevant work, the burden then shifts to the Commissioner to prove the claimant has the residual functional capacity to perform other work in the national economy in view of her age, education, and work experience. *See Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988).  As part of this step, the ALJ may inquire of a vocational expert whether a person with the claimant's limitations would be able to find such work.  In order for the ALJ to rely on the vocational expert's testimony as substantial evidence, however, the ALJ must inquire of the vocational expert whether a person with all of the claimant's specific limitations would be able to engage in substantial gainful work activity. *See Hargis v. Sullivan*, 945 F.2d 1482, 1491 (10th Cir. 1991).

Plaintiff argues the ALJ erred by failing to include the following limitations when questioning the VE: (1) a limitation to sedentary work; (2) a limitation on manipulative ability;

(3) limitations arising due to pain; and (4) a limitation on the ability to maintain attention and concentration.  A review of the hearing transcript, however, shows that—with the exception of Plaintiff's claimed pain levels—each of these limitations was addressed by the VE.  *See* AR 68–69 (discussing sedentary work); AR 70–71 (discussing manipulative limitations); AR 71–72 (discussing attention and concentration).  Accordingly, the ALJ's reliance on the VE's testimony as to these three elements was based upon substantial evidence.

The same cannot be said for the ALJ's failure to inquire of the VE whether Plaintiff's chronic pain—in combination with Plaintiff's other impairments—would limit her ability to engage in substantial gainful employment.  *See Velasquez v. Apfel*, 28 F. Supp. 2d 1285, 1287 (D. Colo. 1998).  Where—as here—the ALJ finds "the claimant has a history of back and lower extremity pain" [AR 21], the ALJ's finding "require[s] that pain be included in the hypothetical to the vocational expert."  *See Talbot v. Heckler*, 814 F.2d 1456, 1465 (10th Cir. 1987); *Velasquez*, 28 F. Supp. 2d at 1287.

Although the ALJ found Plaintiff's testimony regarding the "intensity, persistence and limiting effects" of her pain to be "not entirely credible," her history of painful "medically determinable impairments" was not disputed.  Accordingly, while the ALJ could have appropriately discounted Plaintiff's pain complaints when querying the VE, it was error for the ALJ to exclude pain-related limitations entirely.  *See Velasquez*, 28 F. Supp. 2d at 1287.  On remand, the ALJ must inquire of the VE whether a person with Plaintiff's pain limitations—as determined by the ALJ in accordance with Social Security rules and regulations—would be able to perform substantial gainful employment.

# VII.  WHETHER THE ALJ IMPROPERLY FAILED TO APPLY THE
# MEDICAL-VOCATIONAL GUIDELINES

The Medical-Vocational Guidelines—20 C.F.R. Pt. 404, Subpart P, Appendix 2—are "a classification scheme directing a finding of 'disabled' or 'not disabled' based on a claimant's age, education, work experience, and residual functional capacity to perform work." *Dixon v. Heckler*, 811 F.2d 506, 508 (10th Cir. 1987).  Under the guidelines, a person who is fifty years old—which Plaintiff was on April 23, 2004, despite the ALJ's error to the contrary [AR 23]—with a high school education will be found to be disabled when that person is limited to sedentary work and has no transferable skills.  *See* 20 C.F.R. Pt. 404, Subpart P, Appendix 2, Rule 201.12 & 201.14.  The ALJ, however, did not make a finding regarding whether Plaintiff had transferable skills, stating such a determination was "not material to the determination of disability."  On remand—should the ALJ find Plaintiff limited to sedentary work—the ALJ must determine whether Plaintiff has transferable skills.  If the Government is unable to prove Plaintiff has transferable skills, the ALJ must apply the guidelines and find Plaintiff disabled as of April 23, 2004.  *See Dixon*, 811 F.2d at 511 (holding—once a claimant shows they are unable to perform past relevant work—the burden is on the Government to show the claimant is able to perform alternative work).

## VIII. CONCLUSION

Accordingly, I ORDER that the July 25, 2007, administrative decision in this matter is

REVERSED and REMANDED to the Commissioner with directions to remand to the

Administrative Law Judge for proceedings consistent with this opinion.


Dated: January __13__, 2009.

BY THE COURT:

___s/Lewis T. Babcock_____
Lewis T. Babcock, Judge